**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

UNITED STATES OF AMERICA

vs.                                                    Case No. 6:12-cr-209-Orl-37DAB

ILAN FEDIDA

_____

## ORDER

This cause is before the Court on the following:

1.     Defendant's Motion to Dismiss Pursuant to Rule 12(b), Fed. R. Crim. P.
(Doc. 33), filed October 3, 2012;

2.     United States' Response in Opposition to Defendant's Motion to Dismiss
(Doc. 37), filed October 18, 2012;

3.     Defendant's Supplemental Brief on Motion to Dismiss (Doc. 54), filed
January 11, 2013; and

4.     United States' Supplemental Response in Opposition to Defendant
Fedida's Motion to Dismiss and Hummel's Motion Seeking Return of
Property (Doc. 55), filed February 1, 2013.

The Court held a hearing on Defendant's motion on December 6, 2012. (Doc. 52,
hereinafter "Hr'g Tr.") At the hearing, the Court permitted the Defendant, the
Government, and the claimant in a separate proceeding in which a similar issue was
raised to present argument and testimony as to whether the chemical substances at the
heart of this criminal case are controlled substance analogues.

## BACKGROUND

Defendant Ilan Fedida was indicted for knowingly possessing and conspiring with

others to knowingly possess a controlled substance analogue, which is proscribed by the Controlled Substance Analogue Enforcement Act of 1986 (the "Analogue Act"), 21 U.S.C. § 813, knowing that the substance was intended for human consumption. (Doc. 14.) The Indictment states that the substance involved in the charged offenses was 1-Pentyl-3-(2,2,3,3-tetramethylcyclopropyl)indole, known as UR-144. (Doc. 14.) Subsequent laboratory tests indicated that the substance seized was in fact 1-(5-fluoropentyl)-3-(2,2,3,3-tetramethylcyclopropyl)indole, which the Court will refer to as XLR-11.[1] (Doc. 33, p. 2; Doc. 37, p. 2.) There is no material difference in the chemical structures of UR-144 and XLR-11—the only difference being that XLR-11 contains fluorine and UR-144 does not.[2] The Government has indicated that it intends to seek a superseding indictment charging Defendant with possessing and conspiring to possess both substances. (Doc. 37, p. 2.) The Court therefore will consider Defendant's motion as if the charges relate to both substances.

The Government contends that UR-144 and XLR-11 are both proscribed controlled substance analogues of a schedule I drug known as JWH-18. Its chemical name is 1-pentyl-3-(1-nathoyl)indole, and it is a synthetic cannabinoid. It is sold on the streets as K2, spice, herbal incense, or synthetic marijuana. (Doc. 37, p. 3.) These substances are used, according to the Government, to circumvent federal drug laws by acting as substitutes for marijuana. (*Id.* at 2–4.)

---

[1] This substance is also called 5-flouro-UR-144 and 5FUR-144. (Doc. 37, p. 2.)

[2] The Court refers to "fluorine" or a "fluorine atom" in this Order for simplicity, although the difference is more precisely described as the substitution of a fluoride anion (the reduced form of the element fluorine) in place of a hydrogen of the terminal methyl of the indole core's 1-pentyl functional group. The experts who testified at the hearing thought that the presence of the fluorine in XLR-11 was only a minor change in chemical structure or speculated that it *might be* significant. (*Compare* Hr'g Tr. at 90, 104, 123, 296, *with id.* at 90–91, 134, 158.)

Defendant moves to dismiss the Indictment, contending that he did not have constitutional notice that UR-144 and XLR-11 are controlled substance analogues of JWH-18. (Docs. 33, 54.) The Government opposes. (Docs. 37, 55.)

## STANDARDS

A motion to dismiss made pursuant to Federal Rule of Criminal Procedure 12(b) challenges the sufficiency of an indictment. An indictment is sufficient "if it: (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense." *United States v. Steele*, 178 F.3d 1230, 1233–34 (11th Cir. 1999). In other words, an indictment may be dismissed only "where there is an infirmity of law in the prosecution," not where there are disputed issues of fact that should be developed at trial. *United States v. Torkington*, 812 F.2d 1347, 1354 (11th Cir. 1987). The factual allegations in an indictment must be viewed in the light most favorable to the Government. *Id.*

## DISCUSSION

Defendant argues that the chemical structures of UR-144 and XLR-11 are not "substantially similar" to the chemical structure of JWH-18. (Doc. 33, pp. 5–7.) Defendant also argues that UR-144 and XLR-11 do not have a "substantially similar to or greater" effect than JWH-18 on the central nervous system, and that Defendant did not represent or intend that UR-144 and XLR-11 have such an effect. Defendant clothes these arguments as a vagueness challenge to the Analogue Act.

As discussed in more detail below, the Court does not find these arguments persuasive for two reasons: (1) they raise challenges to the sufficiency of the evidence,

not the Indictment; and (2) the Analogue Act is not vague as applied to UR-144 and XLR-11.

## I.   The Indictment Is Sufficient

First, Defendant's arguments are more properly characterized as a challenge to the sufficiency of the evidence rather than a challenge to the sufficiency of the Indictment. While the Federal Rules of Civil Procedure provide for summary judgment— that is, a pretrial procedure to challenge the sufficiency of the evidence—there is no summary judgment procedure in criminal cases. *United States v. Salman*, 378 F.3d 1266, 1268 (11th Cir. 2004). Because Defendant has not waived his right to a jury trial, this Court cannot make a pretrial determination concerning the sufficiency of the evidence on the issues raised in Defendant's motion.[3] *Id.* The three issues raised by Defendant—(1) whether UR-144 and XLR-11 are substantially similar to JWH-18; (2) whether those substances have an effect on the central nervous system that is substantially similar to that of JWH-18; and (3) whether Defendant represented or intended that those substances have such an effect—are questions of fact which must either be determined at trial by the jury or challenged by an appropriate motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. *See id.*; *see also United States v. Sullivan*, No. 4:11CR3034, 2011 WL 3957425, at *1 (D. Neb. Aug. 17, 2011) (denying a motion to dismiss an indictment charging violations of the Analogue Act because it raised issues of fact that must be resolved at trial).

Second, even assuming that Defendant actually challenges the sufficiency of the

---

[3]   The U.S. Court of Appeals for the Eleventh Circuit has been quite clear on this point, although other circuit courts have reached different conclusions. *See, e.g.*, *United States v. Yakou*, 428 F.3d 241, 247 (D.C. Cir. 2005) ("Only the Eleventh Circuit has held that even where there are undisputed facts a district court may not engage in a pretrial determination of the sufficiency of the evidence.").

Indictment, it "is well-established that the sufficiency of a criminal indictment is determined from its face." *United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006). "The indictment is sufficient if it charges in the language of the statute." *Salman*, 378 F.3d at 1268. "For an indictment to be valid, it must contain the elements of the offense to be charged, and sufficiently apprise the defendant of what he must be prepared to meet." *Sharpe*, 438 F.3d at 1263. In other words, a "district court is limited to reviewing the face of the indictment and more specifically the language used to charge the crimes." *Id.* The Indictment contains the language used in the statute; it gives notice as to what specific conduct is charged; and it apprises Defendant of the charges he must be prepared to meet at trial. It is therefore sufficient; the rules require nothing more.

## II. The Analogue Act Is Not Vague as Applied to UR-144 and XLR-11

As for Defendant's void-for-vagueness challenge—that is, his argument that the Analogue Act does not provide constitutional notice that UR-144 and XLR-11 are controlled substance analogues—the vagueness doctrine requires only that a statute define an offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. *United States v. Fisher*, 289 F.3d 1329, 1333 (11th Cir. 2002). "Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, . . . the more important aspect of vagueness doctrine 'is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Id.* (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).

Vagueness challenges must be evaluated in the light of the facts of the case at

hand. *Id.* Thus, the Court must apply the statutory definition of controlled substance analogue to UR-144 and XLR-11 to determine if ordinary people would be able to determine that those substances are proscribed analogues of JWH-18. *See id.* at 1336–37. If so, the Analogue Act is not unconstitutionally vague as applied to UR-144 and XLR-11. *See id.* This analysis requires the Court to interpret the statutory definition of "controlled substance analogue" which, as discussed below, is more problematic than it may first appear to be. The Court must then apply the statutory definition.

### A.  Statutory Interpretation

Prior to addressing Defendant's vagueness challenge, the Court must interpret the statute in question, starting with the plain language of the statute and the traditional tools of statutory construction. *See United States v. Veal*, 153 F.3d 1233, 1245 (11th Cir. 1998); *see also Shotz v. City of Plantation*, 344 F.3d 1161, 1167 (11th Cir. 2003). The Analogue Act provides:

> Except as provided  . . . , the term "controlled substance analogue" means a substance—
>
> (i)     the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;
>
> (ii)    which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or
>
> (iii)   with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

21 U.S.C. § 802(32)(A). This definition contains three subparagraphs. The first

subparagraph concerns the chemical structure of the putative analogue. The next two subparagraphs relate to the pharmacologic effect of a putative analogue or its intended pharmacologic effect. The conjunction *or* is used between the second and third subparagraphs.

There are two ways to interpret the relationship between subparagraph (i) and subparagraphs (ii) and (iii). The conjunction *or* is commonly used as a coordinating conjunction that joins grammatically equivalent elements. *See* William Strunk Jr. & E.B. White, *Elements of Style* 91 (4th ed. 2000). Thus, the definition can be interpreted in the disjunctive; that is, each subparagraph could be construed to define a category of substances that qualify as controlled substance analogues. Under this construction, a substance is a controlled substance analogue if the requirement of any one of the three subparagraphs is satisfied.

The conjunction *or* is also commonly used as a correlative conjunction to indicate a complementary grammatical relationship. *See id.*; *see also The American Heritage Dictionary* 299 (1973) (defining a correlative conjunction as one that indicates a "reciprocal or complementary grammatical relationship"). The definition therefore can also be interpreted in the conjunctive; that is, the *or* could connote a complementary relationship between the last two subparagraphs relating to the pharmacologic effects of a putative analogue. Thus, the definition could be construed to mean that a substance must satisfy the requirements of subparagraph (i) *and* either subparagraph (ii) or (iii). The question of whether the definition of controlled substance analogue should be read in the disjunctive or conjunctive has not yet been answered in this Circuit. *See Fisher*, 289 F.3d at 1337–38 (expressly declining to answer that exact question).

The first subparagraph states a requirement regarding the chemical structure of a

substance. Subparagraphs (ii) and (iii), on the other hand, both address the pharmacologic aspects of a substance and are plainly written in the alternative. There is no indication, however, whether Congress intended the statute to encompass substances that satisfy the requirements of subparagraphs (i) *and* (ii) or (iii), or substances that satisfy only the requirement of (i) or (ii) or (iii).[4]

The syntax of the definition offers no more assistance. Each subparagraph could be construed as a restrictive clause that imposes an independent definition of "substance" (which appears in the introductory clause of the definition just before the em dash). This construction would support a disjunctive reading.

One could also construe the subparagraphs as a whole. Under this reading, the three subparagraphs define a putative analogue by its the chemical structure (in subparagraph (i)) and its pharmacologic effects (in subparagraphs (ii) and (iii)). Under this construction, the final two subparagraphs (each beginning its substantive requirement with "which") are subordinate to the requirement of the first subparagraph. That is, the final subparagraphs read in parallel, referring to and modifying the substance whose chemical structure is defined in subparagraph (i). This construction would support a conjunctive reading.

The traditional tools of construction likewise do not help to interpret the statutory

---

[4] Indeed, the U.S. Courts of Appeals that have discussed the definition of controlled substance analogue have reached different conclusions on this issue. In *Fisher*, the Eleventh Circuit remarked in *dicta* that a "plain reading of the statute would indicate that the definition should be read in the alternative." 289 F.3d at 1338. The Third Circuit, on the other hand, thought the "definition of a controlled substance analogue reads more naturally in the conjunctive." *United States v. Hodge*, 321 F.3d 429, 436 (3d Cir. 2003). Because the *Fisher* court found it unnecessary to address this issue for it to reach its holding, it did not conduct an in depth analysis of the statute. Having rather closely scrutinized the statutory definition, this Court concludes that the *Fisher* court's reading of the statute is strained rather than plain.

definition. *See United States v. Hodge*, 321 F.3d 429, 436 (3d Cir. 2003). In *Hodge*, the Third Circuit reasoned that the doctrine of the last antecedent suggested that the last two subparagraphs modified the phrase "controlled substance in schedule I or II" in the first subparagraph, rather than the word "substance" in the introductory portion of the definition. *See id.* at 436. This reading is not satisfactory, however. If the two subparagraphs refer to the "controlled substance in schedule I or II" in the first subparagraph, then the requirements of those subparagraphs—both of which require a comparison between putative analogue and a "controlled substance in schedule I or II"—would be meaningless. The doctrine of the last antecedent is also of no moment because, as discussed above, the syntax of the statutory definition does not favor either interpretation. Accordingly, the Court concludes that the Analogue Act's definition of a controlled substance analogue is ambiguous.

The Court turns next to the statute's legislative history. *See Veal*, 153 F.3d at 1245 (noting that review of legislative history is unnecessary unless a statute is "inescapably ambiguous"). Senator Strom Thurmond introduced the Senate bill that would become the Analogue Act. *See* 131 Cong. Rec. 19,411. The bill was intended to make illegal "chemical substances—so called 'designer drugs'—which are not currently covered by the Controlled Substances Act." *Id.* Its purpose was to "prevent underground chemists from producing dangerous designer drugs by slightly changing the chemical composition of existing illegal drugs." *Id.* In the House, Representative Dan Lungren, the bill's sponsor, remarked that the intent of the bill was to close a loophole in the federal drug laws—"the time lag between the production of these new designer drugs and their subsequent control under the Controlled Substances Act." 131 Cong. Rec. 18,938; *see also* 131 Cong. Rec. 19,114–15 (statement of Sen. Hawkins) ("[A]s we have discovered,

as fast as the Government outlaws designer drugs, the chemists can synthesize new ones."); 131 Cong. Rec. 27,311 (statement of Sen. D'Amato) (noting that the bill "closes the loophole in present law that allows the creation and distribution of deadly new drugs without violating Federal law").

Congress intended to close this loophole by using a method of identifying banned substances that was different from the method employed by the Controlled Substances Act. As noted by Senator Alfonse D'Amato, the "problem with the [Controlled Substances Act] is that it defines illegal drugs by referring to their exact chemical formulas." 131 Cong. Rec. 27,311. The proposed legislation did not focus on the "drugs themselves," nor did it "set up a regulatory or administrative framework." 131 Cong. Rec. 32,950 (statement of Rep. Lungren). Rather, Congress intended to make illegal substances that satisfied the definition of controlled substance analogue. 131 Cong. Rec. 19,114 (stating that the bill prohibits the manufacture, distribution, and possession of designer drugs and "specifically defines designer drugs to cover those substantially similar to existing controlled substances"); *see also* 131 Cong. Rec. 18,938 (statement of Rep. Lungren) (same); 131 Cong. Rec. 37,525 (statement of Sen. Thurmond) (explaining that the Senate Judiciary Committee amended the proposed legislation by substituting the term "controlled substance analog" for the term "designer drug"). Thus, the legislative debate concerning the definition of controlled substance analogue is critical to appreciate the meaning and scope of the statute.

The original Senate bill defined a controlled substance analogue as a substance that had a chemical structure substantially similar to a controlled substance in schedule I or II *or* one that was specifically designed to produce an effect substantially similar to a controlled substance in schedule I or II. 131 Cong. Rec. 19,114. This definition appears

10

to support the disjunctive reading of the enacted statute. The House, on the other hand,

defined a controlled substance analogue in its bill as a substance

> (i) the chemical structure of which is substantially similar to the chemical
> structure of a controlled substance in schedule I or II; *and*
> (ii)(I) which has a stimulant, depressant, or hallucinogenic effect on the
> central nervous system; *or*
> (II) with respect to a particular person, which such person represents or
> intends to have a stimulant, depressant, or hallucinogenic effect on the
> central nervous system.

132 Cong. Rec. H6628 (daily ed. Sept. 11, 1986). This definition appears to support a

conjunctive reading of the enacted statute.

When the bill passed by the House was taken up by the Senate, that body

amended the bill by replacing the House's definition of controlled substance analogue

with the definition used in the original Senate bill. 132 Cong. Rec. 13,652–53. The

House then switched the definition back to its version when it took up the Senate's

amendments, 132 Cong. Rec. H9485–86 (daily ed. Oct. 8, 1986), and the Senate

switched it back again when it considered the House's changes to its amendments, 132

Cong. Rec. S15,946 (daily ed. Oct. 10, 1986).

There was no meaningful debate in either the House or the Senate on these

changes. Moreover, the version of the definition ultimately enacted did not appear in the

legislative record until the final version of the bill, and it was not debated on the floor of

either chamber. The legislative history (such that it is) therefore could support either

interpretation of the statute and does not dispositively support either. *See United States*

*v. Vickery*, 199 F. Supp. 2d 1363, 1368–69 (N.D. Ga. 2002).

Thus, even after resorting to the standard tools of statutory construction and

considering the legislative history, the Court concludes that 21 U.S.C. § 802(32)(A) is

ambiguous. In such cases, the Eleventh Circuit has directed courts to apply the rule of

leniency to construe criminal statutes in favor of the defendant. *See United States v. Cruz*, 805 F.2d 1464, 1473–74 (11th Cir. 1986). Because a disjunctive reading of the statutory definition of controlled substance analogue could lead to the criminalization of common substances that are found in nearly every pantry in America, the application of the rule of leniency requires the Court to read the definition of controlled substance analogue in the conjunctive. *See United States v. Turcotte*, 405 F.3d 515 (7th Cir. 2005); *United States v. Klecker*, 348 F.3d 69 (4th Cir. 2003); *United States v. Washam*, 312 F.3d 926 (8th Cir. 2002).

**B.  Statutory Application**

The Court will consider first whether UR-144 and XLR-11 are substantially similarity to JWH-18, as required by subparagraph (i) of the statutory definition. The Court will then discuss whether UR-144 and XLR-11 satisfy the requirements of subparagraphs (ii) or (ii) of the statutory definition.

**1.  Substantially Similar Chemical Structure**

Subparagraph (i) of the definition of controlled substance analogue is satisfied if a substance's chemical structure is substantially similar to the chemical structure of a controlled substance in schedule I or II. Here, the Government contends that the chemical structures of UR-144 and XLR-11 are substantially similar to the chemical structure of JWH-18. The Government reaches this conclusion based on an analysis of the two-dimensional structures of these compounds, which are as follows:

**UR-144**                    **XLR-11**                    **JWH-18**

(Doc. 33-1; Doc. 37-2, Boos Decl. ¶¶ 9, 19.) As described by the Government's expert,
each of these substances has an indole core, which consists of a benzene ring fused to
a nitrogen-containing pyrrole ring. (Boos Decl. ¶¶ 8, 17.) Each substance also has two
substitutions to the indole core. The first substitution takes place at the nitrogen in the
indole core, which is also referred to as the "1-position." In all three substances, the
substitution at the 1-position is a 5-carbon pentyl chain.[5] The second substitution is
located at a carbon atom in the indole core which is located two positions away
counterclockwise from the nitrogen. This is referred to as the "3-position."

UR-144, XLR-11, and JWH-18 differ primarily with regard to the functional group
that occupies the 3-position of the indole core. The 3-position substituent in JWH-18 is a
naphthyl moiety, which is a fused pair of benzene rings, attached to the indole core by a
carbonyl group. The 3-position substituents in UR-144 and XLR-11, however, are

---

[5]  In XLR-11, the pentyl chain is capped with a fluorine atom, the presence of
which is not material to the Court's analysis, either legally or as a matter of fact. *See,
e.g.*, 131 Cong. Rec. 19,115 ("By adding a fluoride or an extra carbon molecule, a new
drug is created which will produce the high or euphoria the user seeks but is not
illegal."); *see also supra* note 2.

tetramethylcyclopropyl moieties, which consist (in part) of three carbon atoms that are linked together in a triangular ring, that are also attached to the indole core by a carbonyl group. Thus, UR-144, XLR-11 (except as noted elsewhere), and JWH-18 share the following chemical structure:



(*Id.* ¶¶ 12, 21.) The R in the figure represents either naphthyl or tetramethylcyclopropyl, depending upon the substance.

The Government argues that the replacement of the naphthyl moiety in JWH-18 with the tetramethylcyclopropyl moiety present in UR-144 and XLR-11 is of minor significance. (*See id.* ¶¶ 14, 23.) As such, the Government and its experts conclude that the chemical structures of UR-144 and XLR-11 are substantially similar to the chemical structure of JWH-18. (*Id.* ¶¶ 24–26.)

Defendant argues that the substitution of a tetramethylcyclopropyl moiety in place of the naphthyl moiety is a significant change in chemical structure. (Doc. 33, pp. 5–7.) Dr. Wayne Morris, Defendant's expert witness, opined that a naphthyl moiety has several properties that are different from a tetramethylcyclopropyl moiety, the most significant of which is naphthyl is an aromatic ring system while tetramethylcyclopropyl is not. (Doc. 33-2, ¶¶ 11–12.) Aromatic ring systems have unique properties arising from

their delocalized electrons and shape. (*Id.* ¶ 12.) Defendant contends that the carbon atoms in an aromatic ring each "share" one electron with the other carbon atoms in the ring, which increases the stability of aromatic rings and causes them to undergo chemical and biochemical reactions differently than other chemical structures. (*Id.* ¶¶ 12–14.) Further, in three-dimensional space, aromatic rings form long, flat structures, allowing them to interact in special ways with other aromatic ring-containing compounds. (Hr'g Tr. 57:22–59:10.) The tetramethylcyclopropyl moiety in UR-144 and XLR-11, on the other hand, has a small, compact, and ball-like structure that does not share electrons or interact with other compounds in the same manner as aromatic rings. (Doc. 33-2, ¶¶ 12, 14.)

Upon consideration, the Court is not persuaded that the statute is impermissibly vague as applied to UR-144 and XLR-11. While Defendant posits several technical and detailed reasons why the substitutions present in these compounds are substantial changes to their chemical structures as compared to JWH-18, the Government need not overcome the critical eye of chemists and other experts.[6] Rather, it must merely show that ordinary people would be able to determine whether UR-144 and XLR-11 are proscribed analogues of JWH-18. *See United States v. Carlson*, 87 F.3d 440, 443–44 (11th Cir. 1996); *see also United States v. Brown*, 279 F. Supp. 2d 1238, 1241 (S.D. Ala. 2003). The substances at issue in this case share the same core chemical structure

---

[6] The Court recognizes that there appears to be a principled disagreement among the experts concerning the significance of the replacement of the naphthyl moiety in JWH-18 with the tetramethylcyclopropyl moiety present in UR-144 and XLR-11. The differing opinions of experts on the issue of substantial similarity does not, however, render the Analogue Act vague. *See, e.g.*, *United States v. Brown*, 279 F. Supp. 2d 1238, 1241–42 (S.D. Ala. 2003). Rather, such testimony should be presented to the trier of fact, who will decide the relative strengths and merits of the methodologies supporting the experts' opinions.

with JWH-18. The only meaningful difference between these compounds is a replacement found within the 3-position substituent. (*See, e.g.*, Doc. 40-2, Harris Aff. ¶¶ 8, 10.) A reasonable layperson who examines the two-dimensional drawings of the chemical structures of UR-144, XLR-11, and JWH-18 could plausibly conclude that such substances are substantially similar. This is all that is required.

### 2. Substantially Similar Pharmacologic Effects

The statutory definition sets forth alternative requirements concerning the pharmacologic effects of a putative controlled substance analogue. Subparagraph (ii) prohibits putative analogues that have an effect that is substantially similar to a controlled substance. Subparagraph (iii) prohibits putative analogues that are intended or represented to have an effect substantially similar to a controlled substance. The third subparagraph is relevant in this case.

The Criminal Complaint alleges that Defendant made a self-incriminating statement to agents regarding UR-144 and XLR-11. (*See* Doc. 1, ¶¶ 31–33.) Defendant acknowledged knowing that UR-144 and XLR-11 are similar to banned substances and candidly conceded that, when consumed by his customers, UR-144 and XLR-11 "do the same thing" as banned synthetic cannabinoids by "mak[ing] people high." (*Id.* ¶ 31.) This statement, in addition to the correspondence proffered by the Government, suffice for the purposes of the instant motion to show that Defendant represented or intended UR-144 or XLR-11 to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

\*   \*   \*   \*   \*

Accordingly, in view of the above, the Court concludes that the Analogue Act is not unconstitutionally vague as applied to UR-144 and XLR-11.

## III. A Comment on the Government's Experts' Opinions

The Government need not convince the Court at this stage whether UR-144 or XLR-11 satisfy the requirements of subparagraph (ii) of the statutory definition. However, because this issue will surely be raised at trial, the Court will take this opportunity to analyze the expert opinions that the Government proffered in opposition to Defendant's motion with regard to the pharmacologic effects of UR-144 or XLR-11.

Some of the opinions of the Government's expert witnesses presented at the hearing do not appear to meet the requirements of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

This rule compels the court to act as a "gatekeeper" in determining the admissibility of expert scientific evidence. *Daubert*, 509 U.S. at 589 n.7, 597; *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc). This Court must use a "rigorous three-part inquiry" in deciding whether to admit expert testimony: (1) the expert must be qualified to testify competently regarding the matters he intends to address; (2) the methodology must be reliable under *Daubert*; and (3) the testimony must assist the trier of fact through the application of scientific, technical, or specialized expertise to understand the evidence or to determine a fact in issue. *Frazier*, 387 F.3d at 1260. The

proponent of the expert testimony bears the burden of proving that the testimony satisfies each prong of this inquiry by a preponderance of the evidence. *Id.* at 1274.

In *Daubert*, the U.S. Supreme Court provided a list of relevant factors to consider in determining whether an expert's methodology was reliable: (1) whether the theory or technique "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "in the case of a particular scientific technique, . . . the known or potential rate of error"; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 592–94; *accord Frazier*, 387 F.3d at 1262. This list is non-exhaustive and the Court has "substantial discretion" in determining how to test an expert's reliability. *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010).

At the hearing, the Government's experts opined that UR-144 and XLR-11 have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of JWH-18. However, these opinions were based on little more than the experts' review of the available scientific literature, which was limited to a few articles containing reports of UR-144's binding affinity to cannabinoid receptors. (Hr'g Tr. 233:10–17 (identifying one scientific report describing the binding affinity of UR-144), 234:1–11 (acknowledging that XLR-11 does not appear in the scientific literature), 238:5-11 (referring again to a single scientific report), 240:23–241:9 (acknowledging the absence of studies on XLR-11's pharmacologic effect), 264:19–22 (relying generally on "examples in our literature" and "structure activity relationships" to predict "how XLR-11 would behave"), 294:20–295:3 (relying on the scientific literature

and "knowledge drawn from structure activity relationships"), 295:16–296:18 (same).)[7]

The opinions of the Government's experts were lacking in other ways, as well. They had not been subjected to peer review or publication. There was no evidence concerning the known or potential error rates of the experts' methodology—which amounted to little more than the deduction of a working hypothesis supported by a general knowledge of chemistry and biochemistry—or whether the experts' opinions and methodologies were generally accepted in the scientific community. The Court is not inclined to permit an expert to testify to a jury where the basis of his opinions rests only on broad scientific principles. *See, e.g.*, *McCain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1240–44 (11th Cir. 2005) (rejecting as too speculative the opinions of an expert witness in a toxic tort case that were based in large part on the "broad principles of pharmacology").[8]

The Court need not rule definitively on the admissibility of this expert testimony at this time, however. The Court is mindful that the Government was not required, and may not have been prepared, to fully adduce a proper foundation for the admission of this testimony at the hearing. In addition, the Government has advised the Court and

---

[7] Indeed, the Government's pharmacology expert implicitly conceded that there is an insufficient basis for her to form an opinion about the pharmacologic effects of UR-144 and XLR-11 when she testified repeatedly under oath that she "anticipated" and "expected" that such an effect would be observed by further studies. (Hr'g Tr. 291:22–292:5, 295:16–296:8.)

[8] This catch-22 is inherent in the conjunctive reading of the definition of controlled substance analogue. As new substances are discovered, there will inevitably be some period of time before experts can determine conclusively a substance's pharmacologic effects. *See, e.g.*, James M. Cameron, *Synthetic Drugs Legislation: Broadening the Classifications by Defining "Controlled Substance Analog" as a Percentage of Common Structural Elements*, 64 Univ. of Detroit L. Rev. 775, 787 (1987) ("In the case of new, never before heard of controlled substance analogs, any expert testimony regarding the effects of the drug would necessarily be speculative.").

Defendant that it is conducting tests which could support its experts' opinions. Thus, the Government may be able to support the admissibility of its experts' opinions regarding the pharmacological effects of UR-144 and XLR-11 at trial. While the Court does not believe it is necessary to direct the parties as to how to prepare for trial, especially in view of the experienced counsel who have appeared in this case, the parties are advised to engage the issue of expert testimony early so that it can be raised and resolved in a way that minimizes any impact a ruling may have on trial.

### CONCLUSION

Accordingly, it is hereby **ORDERED and ADJUDGED** that Defendant's Motion to Dismiss (Doc. 33) is **DENIED**.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on April 30, 2013.

ROY B. DALTON JR.
United States District Judge

Copies:
Counsel of Record